This is Teresa McVicker, PC, versus the Secretary of the Army. It seems like the Army has defended Pelly a couple of times today. 2013, 11-25, Mr. Thomas. Yes, thank you, Your Honor. Judge of the Court, good morning. Your Honor, the Armed Services Board of Contract Appeals aired in its ruling that appellant had to return to the Army more than $49,000 in payments, which the Court held that appellant received for unearned services. Such ruling was made in spite of the fact that the Army and the appellant had a firm fixed-price contract in place and the payments were billed and received. The parties agreed that invoices would be submitted on a monthly basis. After almost one month into the contract, an unauthorized Army official told the appellant to stop work on two-thirds of the contract. Mr. Thomas, the Board found that the Army had violated the duty of good faith and fair dealing. Yes. And awarded lost profits. Right. And so if she doesn't have to give back this money that was paid for services that were not rendered, isn't she going to get a double recovery? No, Your Honor. First of all, the money that she would have to pay back is more than the money that she would receive on lost profits. So the Army would monetarily benefit from its trickery, in essence, because at the same time they were negotiating with this contractor to provide three employees. They were, in the background, negotiating or recruiting them into the federal government to do the same work that they were supposed to do on the contract. And, Your Honor, now we don't know what exactly the ruling represents. It's just a three-sentence ruling, and it just says, honoring services. We don't know if that meant it was a breach of contract or whether it was an overpayment or what. At that point, the two physician assistants, I think they were, right? Yes, Your Honor. Okay. The two PAs were no longer working for your client. Yes. For October and November of that particular year. November and December. November and December of that year. And your client billed for their services. Yes, Your Honor. Yes, Your Honor. First of all, the person that stopped the work was not an authorized official to do so. It was a contracting officer representative. Second, Your Honor, they were under a fixed-price contract in which they were supposed to submit monthly invoices for monthly payments. There was no contract modification made during the time that they were accepting these payments. So, in any event, Your Honor, if you have a contract to pay a certain amount and there is no modification to change that amount, change that price, then it's profit. I mean, by mere definition of the term firm fixed-price profit. Wasn't there a change in the contract in that you alleged a breach? No. We alleged a breach of the contract by virtue of the fact that the workers were taken away from them. Right. Their ability to perform was taken away. So you alleged a breach that changes the relationship of the parties under the contract. Right. And your client continued to bill for individuals that she knew were no longer working for her. But there was also a contract where she was making invoices pursuant to the contract that had not been changed. Now, it had not been changed. There was no contract modification because the person that stopped the work was not authorized to do it. And he didn't tell the contracting officer that he did it. The finding of the board is that the contracting officer didn't even know about it. So, Your Honor, we think that our client was justified, that the appellant was justified in continuing to charge these invoices. Mr. Brown, let me ask you. This case certainly doesn't represent the agency's finest hour in terms of the way your client was treated during the early phases of the contract period. But damages were awarded, and I'd like to just focus on that a little bit. And here's my understanding. The contract period, the base year, is October 1, 2009 through September 30 of 2010, correct? Yes. Okay. That's number one. Number two, your client was paid for October of 2009 in the regular course. Yes, Your Honor. So, we're talking about the remaining 11 months of the contract. Yes. Now, the Board of Contract Appeals said that your client was entitled to lost profits for the base year. Yes, Your Honor. That means she's entitled to lost profits for each of the months November of 2009 through September of 2010, correct? Yes. Okay. Now, assume she is paid those, all right? She gets those lost profits. Now, at the same time, she has also been paid via the bills she submitted for October, I'm sorry, for November and December of 2009, right? Yes, Your Honor. Now, obviously, each of those statements included a lost profit component. Right. Now, if they've awarded her lost profits for November of 2009 through September 2010, and she's also gotten lost profits for those two statements she submitted, why hasn't there been an overpayment of lost profits with respect to two months, namely November and December of 2009? Do you follow my question? Yes, Your Honor, and I would use the inverse of that, too, but let me first answer your question. But first of all, you're probably right, Your Honor. Any profit that she received for the months of November and December would probably be reduced from the lost profits. But by that same token, Your Honor, the board stated that her lost profits, a sum, would have to be reduced by $49,184, which was a sum. They're saying – I mean, I guess what the board is saying, okay, you've gotten lost profits for – we've given you lost profits for November 2009 through September 2010. Right. But you've got to give back these payments you got because, number one, it includes a lost profit component, which we've awarded you for two months, and you can't double recover that. And number two, it includes labor for work which wasn't performed. Yes, Your Honor, but in a firm fixed-price contract, the contractor bears all the risks. They get the profit or they bear the losses. Let me ask you this as a mechanical matter. Have checks been exchanged? Did your client receive a check for the lost profits damages, or is that kind of being held in limbo pending resolution of this litigation? That's correct, Your Honor. If there were any lost profits – I'm sure the Army would not issue us a check for lost profits when they're saying that we owe them $49,000. Okay, so no payments have gone out. Right, exactly, Your Honor. Yes, yes. And, Your Honor, this court has already held at NYC Petroleum that a stop will apply if the performance is hindered – it's caused by a breach. If a contractor's performance is hindered because of the government's breach, and that's definitely what occurred here, that there was a breach. And, Your Honor, as I was saying earlier, it's not clear what the board was saying was the reason for the unearned services, whether it's overpayment or breach of contract. Usually, when someone alleges that a contractor does not deliver services for what it's paid for, it's a breach of contract. And we allege – Well, I think the board, as I understand it, Mr. Cartman, seemed to take the position that what happened here was it was a mistaken payment. They're not charging her with fraud or anything like that. They're saying this was a mistaken payment. We paid for services that were not received. It was a mistaken payment. They're seeking to recoup that under the jurisprudence that does seem to allow that. Well, first of all, Your Honor, the board doesn't say that. It doesn't say anything about mistaken payments. It says unearned services. And that can be construed as a breach of contract. And if it was a breach of contract, then the Army committed the first breach. But she hasn't been charged with a breach of contract, has she? Not unless we construe the board's ruling that being paid for work you didn't do is not a breach of contract. We feel that it can be construed as that. Contract says the contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided. But the appellant stood ready to perform. She knew that these people weren't performing for the government because they didn't work for her anymore. But she had a contract, Your Honor. She had a firm fixed-price contract. I mean, are we going to apply that in every situation? But under the contract, the costs could have been avoided by not being billed. But, Your Honor, she was billing according pursuant to the contract. And, Your Honor, if we follow that line, where does it take us in all the other firm fixed-price contracts that are regularly issued by the government to contractors? It appears, Mr. Brown, that the contractual relationship – no, no, it appears that the – I'm sorry, Mr. Thomas. I'm wearing products, Mr. Brown. No, no, I heard it wrong. You know what it was? I was looking when you started talking about this stuff. My wife told me not to wear – my wife told me not to wear – The previous counsel was Mr. Brown, and I – look, my apologies. Okay. Anyway, Mr. Thomas, I'm sorry. But in any event, the fact is, though, that there was – she was paid for what she was provided. And I guess there's a continuing contractual relationship now, isn't there? Yes, Your Honor. Yes, Your Honor. I think that's a good note. Under the reduced price made pursuant to a contract modification. If we want to reduce price, the proper way to do it is through a contract modification by a contracting officer. That wasn't done here. And Your Honor, the fact of this case are kind of repulsive, really. I mean, here's an 8A contractor being introduced to government contracting, and as she's negotiating with the Army, they're, at the same time, trying to take back what they're giving to her. And I think that's a contravention of public policy. We understand the context. Thank you. And you wanted to save some rebuttal time? Yes, Your Honor. You were into it. We will save it for you. I would save it, Your Honor. Thank you. Ms. Kershner. May it please the Court. There's no dispute here that McVictor billed the government $49,148 for service hours that the physician assistance did not work. What about the idea that this is a fixed-price contract? Yes, Your Honor. The contract terms here are very specific, and we cited them in our brief. The contract terms include FAR 52.2124G, the invoice clause. The invoice clause states, quote, that the invoice must include the description, quantity, unit of measure, unit of price, and extended price of the items delivered. So you are to invoice only for the items you actually deliver. The contract also includes a payment clause, which is FAR 52.2124i. And that payment clause, which we also cited in our brief, states, quote, payments shall be made for items accepted by the government that have been delivered. So the parties contracted that the invoice would only be for items, and the items in this case are service hours. So the agreement is that you will invoice only for your service hours that are delivered to the government, and the government in turn will only pay for those service hours that are actually delivered. I'm not sure if it's in the record or not. Does Ms. McVicker have a history of contracting with the government? Was this for her first contract, or had there been other contracts? It may or may not be in the record. I just can't recall. I'm not sure, but I think the way it comes across, the way I understood it, is that she was known to the Army, and they came to her, so I believe that there was some relationship. That is in the record, but I wasn't sure whether there was anything indicating whether she had had contracts before. I would have to check that, Your Honor. Sorry. At the time that the invoices were submitted, was there a dispute between the Army and Ms. McVicker as to who had possession of the employees, I mean, for whom they were working? No, it was very clear. There was a telephone call on October 30th of 2009 by the contracting officer's representative telling the company, and also speaking, there was another telephone call on that same day with Ms. McVicker, telling her that they had been converted to being government employees. So at that point in time, it was very, very clear. Was there a challenge to that assertion? No, there's no way they can challenge it. You have a fixed price agreement, a contract that's a fixed contract, and then the government comes and converts the very elements that earn the profit under a fixed price contract. Your opponent is saying that because it's a fixed price contract, I still have the right to bill for those people. Not under the contract. Under these situations where the PAs have been converted, as you say, and I think it's recognized that that was improperly done, correct? The board held that this was a termination of the contract, of this particular CLIN, and it was not done in a proper manner. The government terminated the contract in order to take Ms. McIver's employees and convert them. They terminated the CLIN for this particular item. It was terminated, but not terminated in the proper manner. And because it was terminated in an improper manner, the government's damages are not restricted to the damages allowed under the termination for convenience clause. Because the termination was done in an improper manner, then they could get their anticipatory lost profits for the base year of the contract, which is what they were awarded as damages. But the CLIN was over. It was terminated in any event, just terminated in an improper manner, giving them a right to damages that they would not have gotten under the contract, the contract having limited them to a termination for convenience damage. So here, and I did want to make clear as I started, what the contract provided is that you can invoice only for items that are actually delivered, the service hours that you actually deliver. And that's in the FAR clauses I cited, and it's in Appendix Page 43 and also at Appendix Pages 96-97. That's where you'll find the contract clauses. Now, also, the contract also stated that the position assistants were to be paid by McVictor only for the hours that they actually worked. So Mrs. McVictor didn't have any obligation to pay these position assistants if they weren't working for her. And that's in the contract statement of work. It would be at Appendix Page 67. So we think that the board's decision on this point is clear. The board found that these revenues were unearned and that they could not be retained and they were an overpayment. And they are clearly an overpayment under the terms of the contract that we have cited, the FAR clause. In the opening brief that was submitted, the appellant is raising new arguments, none of which they chose to raise before the board. These are four new arguments that they could have raised before the board. Nothing prevented them from raising them to the board. But isn't the case that until the board rendered its decision, they weren't in a position to make some of these arguments? No, because the government's position was always clear. The government contracting officer put in a claim asserting that these were overpayments. And the government argued before the board that these were overpayments under the contract. So given that that was the government's position, they had the ability to assert any defense that they thought they had. And these arguments that they are raising in their opening brief here are in the nature of additional defenses. One would only get to them. It's correct. One would only get to them. If you agree that there had been an overpayment under the contract. But it was always the government's position, an argument at the board, that these were overpayments. And they had the opportunity and the duty to raise at the board every defense that they had. And these are in the nature of additional defenses that they declined to raise at the board. I did want to just touch on them briefly. These new defenses that they are raising or seeking to raise here. Traditionally, this court has viewed an effort to raise a new defense that they failed to raise at the board as being a waiver situation. And there's nothing especially different here that should lead the court to conclude that these defenses were not waived. You're talking about the public policy arguments it's made and the detrimental reliance argument? Yes. And the mathematical error argument as well. And then the argument of a prior material breach. Those four new arguments, which are the only arguments really raised in their opening brief here. With regard to the argument of equitable estoppel and the reliance on the U.S. petroleum case, this court's decision in U.S. petroleum, what we pointed out in our brief is that they haven't demonstrated the elements of an equitable estoppel. Even assuming in the first place that that would be a defense. And with respect to the U.S. petroleum case, what we would point out is that in U.S. petroleum, the contractor adhered strictly to the terms of the contract. And it followed the contract in putting in the invoices to the government that the government then paid. That contrasts here with a clause in this contract that says that you can invoice only for items that are actually delivered to the government. And the government, under that same FAR clause, will pay only for items that are actually delivered. And that is a vast difference between the situation that was presented to the court in the U.S. petroleum case. And then also, we pointed out that there's no real detriment to the contractor in this case. Because the detriment is, as the Supreme Court said in the Heckler case, it's simply the inability to retain money that the contractor never should have had in the first place. Never should have been paid to the contractor in the first place. Now, with regard to the public policy argument, what we've said is that the contract allows... You're saying if there's a public policy, it's a public policy and the government being able to recoup the stake in payments. Yes. And these payments were made not in accordance with the contract terms. The court asked about the mathematics of the two claims. The board has remanded the case to the parties. And what we would anticipate is that the amount of lost profits that are due on the contract claim that Mrs. McVictor won, that they would be calculated on the remand. And then the two claims would be adjusted. And by adjusted, I mean that if the government's claim for recoupment of payments is a fixed amount. One question, was Mr. Thomas agreeing that I want to make sure I was correct? There's no question here about the October 2009 timeframe. I mean, she billed and was properly paid for that. So we're just talking about November of 2009 through September of 2010. That's correct. And for the month of October, she billed precisely for the number of service hours that were rendered, the number of service hours delivered to the government. She was not billing a fixed amount. She billed exactly for the number of hours delivered. It's only after that point in time that she starts billing for service hours that are not delivered. Now, as I said, the government's claim is for $49,148 a fixed amount, which is the wrongful invoices and the wrongful payments. So we would anticipate that on remand, there would be a calculation of the amount of lost profits starting from November 1st up through September 30th, 2010. And if that amount is, for example, $30,000, I'm not saying that it is. I'm just saying hypothetically, if it's $30,000, that would then be subtracted from the government's claim. And Mrs. Victor would only owe the difference plus the CBA interest. Anything further, Ms. Gershwin? No. Thank you. Mr. Thomas has a little less than two minutes rebuttal time. Thank you, Your Honor. I'll have to talk to that. First of all, Your Honor, the point made about the invoices and what was delivered. Ms. McVicker submitted the invoice to the proper authority, the contracting officer representative who was authorized to approve the payment. And by the way, this is the same person who stole the employees, who took her employees. He approved each and every invoice. On the invoice, McVicker put a phrase stating that we intend to bill until the same amount, until a contract modification has been issued. The COR saw every single invoice, approved every single invoice. She also specifically put once she did not claim that the two PAs, that their services were delivered. That's first of all. Second, as far as what? The COR knew all the facts about it. He knew all the facts and he still approved the invoices, each and every single one. As to McVicker's experience, she was not referred by the Army. She was referred by the SBA. When an agency has an 8A contract, they ask the SBA to refer an adequate contractor. The SBA referred Ms. McVicker, who is relatively new. Thank you for bringing that up. Yes, she's relatively new. Had she had government contracting experience other than this contract? Yes, but not substantial. Some, but not much. Right. In fact, in 8A contracts, the SBA is really the prime contractor. The subcontractor. Right. In that context. Secondly, as far as the mistake. There's a real contention here about whether a mistake was made or not. Because the person knew all of the facts and approved it. Your Honor, as far as the opening brief, the four so-called new arguments, Your Honor, we were dependent, as was suggested in the ruling that came out. And the limited nature of the ruling, as I said, it's not clear whether it's a breach of contract or an overpayment. We suggest that it's not an overpayment. And, Your Honor, the case cited by the defendant for bringing up new arguments, this is not a situation like Casey, Your Honor. We are not, in Casey, the person, the contractor changed its position. We are not challenging the underlying facts. Mr. Thomas, you're aware your red light is on?  That's what that's for. That's what our instructions say. Well, Your Honor. Do you have one final sentence to sum up? Yes, Your Honor. If the contract was a, if the board's ruling represents a breach of contract, the Army breached it first. And they should be, and the appellant should be excused from returning payments. Under the public policy argument, the same thing. We don't have to make an argument before the board, before the court. I think that's two sentences. Thank you, Mr. Thomas. We'll take the case under advisement. Thank you, Mr. Clark. Thank you, Mr. Thomas.